UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIMOTHY S. GAGNON, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-07-1767 |
| | § | |
| WING AVIATION, LLC, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

## I. Introduction

Pending before the Court is the defendant Wing Aviation, LLC's ("Wing") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Also before the Court are the defendants United Technisource, Inc. ("UTI") and AIS Tech Services, Inc.'s ("AIS") motion for summary judgment. The plaintiff, Timothy Gagnon ("Gagnon"), responded to each motion. Wing, UTI, and AIS (collectively the "defendants") submitted replies to Gagnon's response which he answered with a sur-response in opposition. Because the motions are similar in form and substance, the Court will consider them simultaneously. Having carefully reviewed the parties' submissions, the record and the applicable law, the Court GRANTS in part and DENIES in part the defendants' motions for summary judgment.

## II. Factual Background

In February of 2004, Timothy Gagnon entered into a contract with UTI to work as an aircraft painter at Wing's work facility located in Conroe, Texas. According to the terms of the contract, Gagnon would serve as a UTI employee and could neither solicit nor accept employment directly or indirectly from Wing. UTI would pay Gagnon a "Straight Time" rate of $5.50 per hour and an overtime rate of $20.00 per hour. Because his permanent residence was

located in Brady, TX and approximately three-hundred miles away from Wing's Conroe facility, Gagnon also received a per diem allowance of $12.50 per hour for every hour worked up to a maximum of $500.00 per week in accordance with a Per Diem Certificate and Per Diem Policy (the "Certificate") to offset travel and living expenses incurred throughout his employment.

From February to May 2004, Gagnon worked as an aircraft painter alongside other Wing employees under the direction and daily supervision of Wing employees.  His supervisors at Wing set his hours, determined his weekly wages, and supplied the equipment and chemicals necessary to perform his work.  During his employment, Gagnon maintained a temporary address at the Corporate Inn in Conroe, where he incurred transportation and lodging expenses roughly around $176 plus tax per week in addition to food expenses.  Upon departing from Wing in May, he worked as an aircraft painter at three different maintenance facilities for three different staffing companies outside of Texas until October 2004.  Despite being employed outside of Texas, Gagnon still maintained his permanent residence in Brady.

In October 2004, Gagnon resumed working for UTI at Wing's facility under the same terms and conditions as his previous employment and renewed his temporary residence in Conroe.  At all times during his employment with UTI, Gagnon's only communication with UTI consisted of questions related to his paycheck.  In June 2005, Gagnon received notification that AIS acquired UTI and that all UTI employees would be transferred to AIS.  Later that month, Gagnon executed a contract with AIS containing identical terms as his previous contracts with UTI.  In July 2005, Gagnon and AIS entered into a new employment contract to reflect a one dollar increase to his overtime rate and per diem allowance.

In October 2005, Gagnon relocated his permanent residence to Willis, TX, which placed him approximately nine miles from Conroe.  However, Gagnon failed to inform UTI or AIS of

his subsequent relocation to Willis.  Around that same time, Gagnon began to make several appointments with his doctor, Miguel Flores, M.D. ("Dr. Flores"), to treat him for stress he developed along with the allergic reactions to the medicine prescribed to him.  These visits often required him to miss significant periods of work ranging from hours to days.[1]  As his stress continued to prolong, Gagnon asked his supervisors at Wing if he could work fewer overtime hours due to the problems related to his stress.  However, his supervisors insisted that he continue to put in overtime saying that they needed him to be available.

On January 16, 2006, Gagnon attempted suicide by digesting an overdose of medication prescribed to him.  After being evaluated by the hospital, he was eventually released and returned to work on January 24.  In February 2006, while he was making a request to his supervisor, Steven Bowles, for less time to work, Gagnon's leadman, Alex Martinez, and another co-worker, Marcus Cruz, began to mock him for making requests for time off from work. Gagnon responded by cursing at the two of them and then proceeded to leave work.  The next day, Gagnon received notice that he was terminated from work for using profanity towards a superior worker.  Following his dismissal, the Texas Workforce Commission ("TWC") awarded him unemployment compensation, which discontinued when he was unable to attend group meetings as part of his requirement to remain eligible for receipt of it.  Gagnon also obtained social security disability benefits after an administrative law judge found that he was totally disabled after he was terminated from his job.

---

[1] Gagnon's medical visits occurred between October 2005 and December 2005.

## III. Contentions

## A. The Defendants' Contentions

The defendants contend that the per diem allowance paid to Gagnon was in accordance with the Fair Labor Standards Act ("FLSA") and Fifth Circuit precedent.  They specifically claim that Gagnon received more than time and one-half his regular rate for overtime compensation earned during his work tenure.  Accordingly, the defendants argue that they are entitled to summary judgment on Gagnon's FLSA claim.  Moreover, UTI and AIS allege that Gagnon failed to abide by the terms of the Certificate to inform them of any subsequent permanent residence relocations or excess payments.  Thus, because there is sufficient evidence showing that the employment contracts are not in violation of the FLSA, UTI and AIS state that they are entitled to summary judgment on their counterclaims for breach of contract and fraudulent misrepresentation.

The defendants also argue that there are no genuine issues of material fact to preclude summary judgment on Gagnon's claim under the Americans with Disabilities Act ("ADA"). They assert that he cannot show that he was disabled or had a record of a disability prior to his attempted suicide or termination.  The defendants also allege that he fails to establish that he was qualified for his job due to his inability to perform overtime work.  Furthermore, they contend that Gagnon was not subjected to an adverse employment action on account of his alleged disability.  Hence, the defendants claim that they are entitled to summary judgment on his ADA claim.

## B. The Plaintiff's Contentions

Gagnon asserts that there is sufficient evidence to support his FLSA claim against the defendants.  He contends that the hourly character of the per diem allowance should be added to

his "Straight Time" hourly pay to properly calculate his regular rate and his overtime rate in accordance with the FLSA. Gagnon further alleges that the authority cited by the defendants is factually distinguishable from this case and is not supported by the Department of Labor's interpretive guidance. Accordingly, there are genuine issues of material fact to address as to whether the employment contracts Gagnon entered into with UTI and AIS were in violation of the FLSA. Thus, summary judgment is not appropriate for Gagnon's FLSA claim and UTI and AIS's counterclaims.

Gagnon further claims that there are genuine issues of material fact to preclude summary judgment on his ADA claim. He alleges that his mental illness qualifies as a disability that substantially limited his ability to work and other major life activities. Gagnon also states that he had a record of his disability that the defendants were aware of at the time of his termination. Moreover, he argues that he was able to perform the essential functions of his job and that the defendants' failure to accommodate his disability amounted to discrimination under the ADA. Accordingly, Gagnon contends that the defendants are not entitled to summary judgment on his ADA claim.

## IV. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "The [movant] bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact." *Lynch Props., Inc. v. Potomac Ins. Co*., 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex v. Catrett*, 477 U.S. 317, 322-25 (1986)). Once the movant carries this initial

burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).  The nonmovant must go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  The nonmovant may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts. Fed. R. Civ. P. 56(e).  "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).  In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch*, 140 F.3d at 625.  "A dispute regarding a material fact is 'genuine' if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party." *Roberson v. Alltel Info. Servs*., 373 F.3d 647, 651 (5th Cir. 2004).  Thus, "[t]he appropriate inquiry is 'whether the evidence represents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251-52).

## V. Analysis & Discussion

## A. Fair Labor Standards Act

The FLSA provides that an employee engaged in commerce must receive one and one-half times the regular rate of pay for hours worked in excess of forty hours per week.  29 U.S.C. § 207(a)(1).  An employee's regular rate of pay shall not include reasonable payments for traveling expenses, or other expenses, incurred by an employee in furtherance of an employer's interests and properly reimbursable by the employer.  *Id.* § 207(e)(2).  The Code of Federal Regulations interprets the FLSA to be applicable to reimbursement "[w]here an employee incurs

expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer." 29 C.F.R. § 778.217(a).  Moreover, payments made by the employer to cover such expenses are not included in the employee's regular rate if the reimbursement amount reasonably approximates the expenses incurred.  *Id.*

The Fifth Circuit addressed the issue of whether per diem payments by an employer should be excluded from computing an employee's wage rate.  *Berry v. Excel Group, Inc.*, 288 F.3d 252 (5th Cir. 2002).  In *Berry*, the employee received a per diem allowance between $100 and $150 per week as a reimbursement of his travel expenses in addition to his hourly wage.  288 F.3d at 254.  In calculating the reimbursement rate with the employee's weekly commute, the Fifth Circuit concluded that the per diem payments were reasonable and appropriate and thus should not be included in computing his wage rate.  *Id.*  The court further held that the FLSA required each employee's expenses to be examined on a case-by-case basis to determine whether authorized per diem allowances would be appropriate and reasonable.  *Id.*

The defendants argue that the per diem allowances provided to Gagnon were reasonably approximate to his reimbursable expenses and thus are excludable from his regular rate of pay. However, the record lacks sufficient evidence from which to draw the conclusion that the per diem amounts were a reasonable approximation of Gagnon's expenses.  The evidence presented shows that Gagnon incurred roughly $176 in traveling and lodging expenses to commute from his temporary residence to Wing's facility in Conroe.[2]   During his employment with the defendants, Gagnon earned between $12.50 and $13.50 per hour in per diem up to a maximum of $500 and $540 per week, respectively.  Thus, unlike *Berry* where the employee received a flat per diem rate that could be calculated to determine his actual reimbursement rate, Gagnon's per

---

[2] The record does not contain any additional evidence detailing costs for food, transportation to his permanent residence or any other relevant expenses Gagnon incurred.

diem was determined by the number of hours he worked at his job, assuming he worked less than forty hours per week. *Id.*

Gagnon also cites the Department of Labor's Field Operation Handbook (the "Handbook") as evidence of the agency's interpretation of the applicable provisions regarding his FLSA claim. The Handbook provides that if the amount of per diem or other subsistence payment is based upon the number of hours worked per day or week, then such payments will be considered part of the employee's regular rate of pay in their entirety. U.S. DEPT. OF LABOR, WAGE AND HOUR DIVISION, FIELD OPERATION HANDBOOK 32d05-32d07 (2000). An agency's interpretation can be considered for its persuasive power regardless of a regulation's clarity. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Belt v. Emcare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006). Because the Handbook has spoken to the specific issue concerning Gagnon's FLSA claim, the Court finds that it is persuasive, holding that the per diem allowance is to be included in Gagnon's regular rate of pay. However, the defendants cite *Brennan v. Padre Drilling Co., Inc.*, 359 F.Supp. 462 (S.D. Tex. 1973), to argue that hourly per diem payments have been held to be in compliance with the FLSA to exclude them from an employee's regular pay. In *Brennan*, the court found that there was evidence detailing the number of miles traveled by employees receiving per diem payments in addition to the frequency they would have to change job locations and residences. 359 F.Supp. at 464. Moreover, the court noted that the record contained evidence showing that the per diem payments were provided to cover expenses for gasoline, oil, lodging, and for any general automobile depreciation. *Id.*

Although the defendants show that it was customary for maintenance workers to hold temporary residences due to long work hours at the aircraft facilities, there is nothing in the record showing that the per diem allowance was tailored to cover Gagnon's actual expenses for

temporarily residing in Conroe while maintaining his permanent residence in Brady.  In the cases cited by the defendants, the courts found that there was significant evidence to determine that the per diem payments covered the reasonably approximate expenses actually incurred by the employees.  Here, the employee contracts and the Certificate merely state the amount of per diem awarded to Gagnon without any details as to what expenses would be covered under the agreement.  The Court cannot conclude, from the evidence presented, that Gagnon's per diem allowance was reasonably approximate to his actual expenses.  Accordingly, the defendants' motions for summary judgment on his FLSA claim are denied and the issue is resolved in favor of the plaintiff.[3]

## B. Americans with Disabilities Act

The ADA prohibits discrimination by covered entities against qualified individuals with a disability.  *Sutton v. United Airlines, Inc.*, 527 U.S. 475, 477 (1999).  Specifically, the act provides that a covered employer shall not discriminate against a qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.  *Id.* at 477-78; 42 U.S.C. § 12112(a).  The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  *Sutton*, 527 U.S. at 478 (quoting 42 U.S.C. § 12102(2)).  In order to make out a *prima facie* case of disability discrimination under the ADA, a

---

[3] UTI and AIS also moved for summary judgment on their counterclaims against Gagnon for breach of contract and fraudulent misrepresentation.  They allege that because he failed to inform them about his relocation from Brady to Willis during his employment, he is liable for any excess per diem payments that were provided to him under the employment contracts and the Certificate.  Gagnon responds by arguing that the contracts and the Certificate violated the FLSA and thus precludes him from any liability.  Because Gagnon's FLSA claim has been decided in his favor, the Court refuses to hold that UTI and AIS are entitled to summary judgment on their counterclaims.

plaintiff must show that: (1) he is disabled or regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003).

The defendants contend that there are no genuine issues of material fact as to whether Gagnon possessed a "disability" as defined under the ADA. They also argue that he was not a qualified individual because he was not able to perform all of the essential functions of his job. Gagnon counters by arguing that there is sufficient evidence to show that his mental illness substantially impaired his ability to work. He further asserts that because he continued to work at Wing's facility until his termination, he was still capable of performing the essential functions of his job had the defendants accommodated his illness by requiring him to work less overtime.

An impairment, standing alone, is not necessarily a disability as contemplated by the ADA. *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995). To qualify as a disability, a mental or physical impairment must substantially limit an individual's ability to perform at least one major life activity. *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655 (5th Cir. 2003). The EEOC regulations interprets "substantially limit[ed]" to mean "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195-96 (2002) (quoting 29 C.F.R. § 1630.2(j)). In determining whether an individual is substantially limited in a major life activity, the regulations advise that the following factors should be considered: "[t]he nature and severity

of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact or the expected permanent or long-term impact of or resulting from the impairment." *Id.* at 196 (quoting §§ 1630.2(j)(2)(i)-(iii)).

Here, Gagnon asserts that his mental illness substantially limited his ability to perform his job duties at Wing.  He refers to evidence regarding his attempted suicide to further argue that his illness rose to a level that it substantially limited his ability to perform almost all activities of central importance to his everyday life.  However, there is nothing in the record that offers any support for his contention.  The evidence shows that Gagnon missed a few days of work due to work-related stress dating back to October 2005 and was taking medication as a remedy.  Gagnon began to suffer allergic reactions from his medication and sought to work fewer hours until he was able to stabilize his reactions.  In his deposition testimony, Gagnon stated that he was still able to work forty hours per week and that he only requested to work less overtime hours.  Thus, he was not prevented or severely restricted from performing the manual tasks at his job.  *Id.* at 198.  Moreover, Gagnon never suggests that his mental impairment would continue permanently or for a long period of time.  An impairment's impact must be permanent or long-term in order to prove an actual disability under the ADA.  *Id.*  Thus, the Court concludes that there are no genuine issues of material fact as to whether Gagnon's mental illness substantially limited his ability to perform his job duties.

The Court also finds that there is insufficient evidence to conclude that Gagnon had a record of a mental impairment during his employment.  In order to present a claim for discrimination based on a record of impairment, a plaintiff must show that at some point in the past, he was classified or misclassified as having a mental or physical impairment that substantially limits a major life activity.  *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1121

(5th Cir. 1998) (citing *Burch v. Coca-Cola Co.*, 119 F.3d 305, 321 (5th Cir. 1997)).   In his deposition testimony, Gagnon concedes that he never provided any documents from his doctor that would provide his supervisors with any knowledge of his alleged depression or allergic reactions from his medication.  Although the record contains notes from Dr. Flores to inform his supervisors of his whereabouts on particular days, these notes do not provide any information regarding Gagnon's medical condition or any indication that he suffered from stress or was depressed.  Moreover, Gagnon fails to show that any impairment he endured during his tenure at Wing substantially limited his ability to perform his job duties.  *Id.*  Thus, he fails to raise a genuine issue of material fact to show that he had a record of a mental impairment.[4]

The defendants further argue that there are no genuine issues of material fact as to whether Gagnon was a "qualified individual with a disability."  Specifically, it argues that because he complained about not being able to work overtime hours, he was unable to perform the essential functions of his job.  Gagnon responds by arguing that he could perform his job duties despite his disability with a reasonable accommodation.  He further alleges that the defendants failed to accommodate his disability by requiring him to work overtime instead of allowing him to work fewer hours at Wing's facility.

A "qualified individual with a disability" is an individual who is able to meet all of the job's requirements in spite of his handicap.  *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996).  To avoid summary judgment, a plaintiff must show that (1) he could perform the essential functions of the job in spite of his disability, or (2) that a reasonable accommodation of such disability would have enabled him to perform the essential functions of the job.  *Burch v. City of Nacogdoches*, 174 F.3d 615, 619 (5th Cir. 1999) (citing *Turco*, 101

---

[4] Because Gagnon does not argue that he was "regarded as" disabled by the defendants, the Court declines to further discuss this element to determine if he was "disabled" under the ADA.

F.3d at 1093). The Code of Federal Regulations permits functions to be defined as "essential" because, *inter alia*, "the reason the position exists is to perform that function; [and]…because of the limited number of employees available among whom the performance of that job function can be distributed." *Id.* at 620 (quoting 29 C.F.R. § 1630.2(n)(2)).

Here, the defendants submitted a declaration from Scott Wesley ("Wesley"), a manager at AIS, in which he stated that their clients' projects required skilled workers who could work substantial hours in order to complete them under short deadlines. Wesley further stated that it was customary for aircraft maintenance facilities to hire employees from staffing companies in order to assist their clients in completing their tasks in a timely manner. Gagnon testified that he was aware of the requirement to perform overtime hours at Wing's facility so that the projects he worked on would be finished by the deadlines as set by Wing. Moreover, the record contains evidence showing that Gagnon possessed a significant amount of work experience as an aircraft painter prior to his employment with the defendants. Thus, there is sufficient evidence indicating that Gagnon was aware that he was hired by the defendants to work on projects that required special skills and long hours. The ability to work overtime has been considered an "essential function of a job" under the ADA. *Rios v. Indiana Bayer Corp.*, 965 F.Supp. 919, 923-24 (S.D. Tex. 1997). Accordingly, the Court finds that the requirement for Gagnon to work overtime hours was an essential function of his job that he was unable to perform.

Gagnon further asserts that the defendants failed to accommodate his mental impairment by allowing him to work fewer hours at Wing's facility. He also argues that the defendants could have required other employees to work additional time in order to make up the time he would not work. The ADA does not require an employer to relieve, modify, or reassign the essential functions of an employee's job to accommodate an employee with a disability. *Burch*, 174 F.3d

at 621.  The Fifth Circuit has stated that "an accommodation that would result in other employees having to work harder or longer is not required under the ADA."  *Turco*, 101 F.3d at 1094.  "Such redefinition exceeds reasonable accommodation."  *Bradley v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 3 F.3d 922, 925 (5th Cir. 1993), *cert. denied*, 510 U.S. 1119 (1994).

As noted above, the record contains significant evidence showing that Gagnon never informed any of his supervisors of any mental impairments that he possessed during his employment.  While he requested the defendants to allow him to work fewer hours, his own testimony states that he never provided them with a reason that would put them on notice that he was depressed or unable to perform his job duties without any reasonable accommodations.  Moreover, Gagnon's request would require other Wing employees to work more hours in order to make up for the time that he would no longer be required to do.  Such a request does not amount to a reasonable accommodation under the ADA.  *Id.*  Accordingly, Gagnon fails to raise a genuine issue of material fact that he was a "qualified individual with a disability" under the ADA.

The Court further concludes that there are no genuine issues of material fact as to whether the defendants terminated Gagnon because of his alleged disability.  In order to make a *prima facie* showing of discrimination, a plaintiff must also establish that he suffered an adverse employment action because of his disability.  *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 282 (5th Cir. 2000).  Here, the defendants contend that they dismissed Gagnon from his job because he used profane language towards a superior employee.  Gagnon does not refute this contention but claims that their reason for terminating him is baseless given that such language was used frequently at the facility.  However, Gagnon fails to cite any evidence indicating that it was common for employees to directly engage in such conduct towards superior or high-ranking

employees at Wing's facility.[5]   Moreover, nothing in the record suggests that the defendants'

reason that his insubordination led to his subsequent termination was merely a pretext for

discrimination due to his alleged disability.   Accordingly, the Court holds that Gagnon fails to

establish a genuine issue of material fact regarding his ADA claim.[6]

## VI. Conclusion

Based on the following, the Court hereby GRANTS the defendants' motions for summary

judgment as they relate to Gagnon's ADA claim.   The Court DENIES the defendants' motions

with respect to Gagnon's FLSA claim and UTI and AIS's counterclaims and HOLDS that the per

diem allowance is to be included in Gagnon's regular rate of pay.   The defendants are

ORDERED to recalculate Gagnon's rate of pay, determine the credit that is due based on his

relocation, and submit same to Gagnon and the Court for review.

SIGNED and ENTERED this 12th day of November, 2008.

Kenneth M. Hoyt
United States District Judge

---

[5] Although Gagnon draws the Court's attention to the TWC ruling in which it said that such language was commonly used amongst employees, this holding alone does not stand as sufficient evidence of a discriminatory intent.  In its decision, the TWC never cites any specific conduct showing that employees would use profane language towards superior employees in an insubordinate manner or that such conduct was accepted by Wing's supervisors. Moreover, Gagnon neglects to present such evidence that would show that such conduct was appropriate.

[6] Because the Court concludes that there are no genuine issues of material fact regarding Gagnon's ADA claim, it declines to address the issue of whether the defendants are jointly liable under the ADA.