1                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION

3

   TIMOTHY S. GAGNON,        .  Civil Action
4                      .  No. 07-1767
                      .
5   VS.                  .
                      .
6                      .
                      .  CORRECTED VERSION
7                      .
                      .
8                      .
   WING AVIATION, LLC, and   .
9   UNITED TECHNISOURCE,    .  October 21, 2010
   INC., and AIS TECH      .  9:06 A.M.
10  SERVICES, INC.         .  HOUSTON, TEXAS

11                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE KENNETH M. HOYT
12            UNITED STATES DISTRICT JUDGE

13

   APPEARANCES:
14

   FOR PLAINTIFF:           MS. JO MILLER
15                     Law Office of Jo Miller, PC
                     505 N. Main
16                   Carriage House
                     Conroe, Texas 77301
17

18  FOR DEFENDANT WING:     MR. STEPHEN W. SCHUELER
                     Winstead, PC
19                   1100 JPMorgan Chase Tower
                   600 Travis Street
20                  Houston, Texas 77002

21

22

23

24

   Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

```
 1  APPEARANCES (Continued):

 2

 3  FOR DEFENDANT
    UNITED TECHNISOURE and
 4  AIS:                       MR. ROBERT G. CHADWICK, JR.
                               Campbell & Chadwick, PC
 5                             4201 Spring Valley Road
                               Suite 1250
 6                             Dallas, Texas 75244

 7

 8  ALSO PRESENT:             Mr. Timothy S. Gagnon

 9

10

11

12  OFFICIAL COURT REPORTER: MS. STEPHANIE KAY CARLISLE
                             U.S. District Court
13                           515 Rusk, Suite 8016
                             Houston, Texas 77002
14                           713.250.5157

15

16

17

18

19

20                          *  *  *

21

22

23

24

25
```

**P R O C E E D I N G S**

(October 21, 2010)

THE COURT:  All right.  Good morning, again.  We'll start with Cause No. 2007-1767, Gagnon versus Wing Aviation, LLC, United Transource -- Technisource, I'm sorry, and AIS Tech Services.

Who is here in behalf of the plaintiff?

MS. MILLER:  Jo Miller, Your Honor, in behalf of Tim Gagnon.  And Mr. Gagnon is here with me today.

THE COURT:  Very good.

And representing Wing Aviation, LLC?

MR. SCHUELER:  Steve Schueler, Your Honor.

THE COURT:  And United Technisource?

MR. CHADWICK:  Robert Chadwick, also representing AIS Tech Services.

THE COURT:  All right.  Very good.

All right.  Ladies and gentlemen, I think we have moved, I guess, down the field a bit.  We at least know what the bottom line is.  We just can't agree upon what that bottom line is.  Is that where we are?

And let me just say, as a preliminary matter, that the order I entered regarding Wing Aviation, I believe, Inc., for all practical purposes, does not get Wing Aviation, LLC, out of the lawsuit.  The question, I gather, raised by counsel for Wing Aviation, LLC, is whether or not that should

09:06:01AM

09:06:22AM

09:06:37AM

09:06:49AM

09:07:11AM

1  be corrected by now entry of a different or separate order so

2  that the, quote, intentions of the parties, end of quote, is

3  affected.

4                    So, let me ask whether or not, Ms. Miller,

09:07:35AM  5  you-all have come to any closer understanding in this matter?

6              MS. MILLER:  Your Honor, we have not.  It is our

7  position and has been from the beginning, except for

8  December 1st when we were here, when initially it was

9  represented that AIS and UTI would be responsible for the

09:07:59AM  10  attorney fees as well as the damages in The Fair Labor

11  Standards Act case.

12                    It became apparent later that day that that was

13  not going to happen.  And the Court may or may not recall, but

14  we objected to the entry of the order dismissing Wing

09:08:16AM  15  Aviation, Inc.  And we also filed a Motion to Reconsider prior

16  to the close of this case and before it was appealed.  So --

17  and at the Fifth Circuit we identified Wing Aviation, LLC, and

18  Wing Aviation, Inc., as interested parties; and we also sent a

19  copy of our Fifth Circuit brief to Wing Aviation.

09:08:41AM  20                    So, it is our position that they are in the

21  lawsuit, they are joined employers.  That's the purpose of

22  Mr. Gagnon being here today, if the Court needs some testimony

23  to understand the joint employer relationship.  And we would

24  ask the Court to proceed with Wing Aviation, LLC, as a

09:08:58AM  25  joint -- as the joint employer with joint and several

1    liability.

2         THE COURT:  Well, I'm not sure that we need to go

3    back and remark the road again.  The Fifth Circuit has already

4    determined that the funds are due and owing.  Apparently, they

09:09:13AM  5    have not been paid.  So, let me ask a question regarding

6    another matter.

7              Have you done any post-judgment discovery in

8    this matter to determine what the financial status of AIS and

9    United Technisource might be, whether or not they have the

09:09:31AM 10    funds at all or ever had the funds to pay the judgment in the

11    case?

12         MS. MILLER:  Your Honor, I did some post-judgment

13    discovery both to AIS/UTI as well as to Wing Aviation,

14    which -- you know, even if it is not determined that they are

09:09:49AM 15    a party, it's still entitled to post-judgment discovery.  Wing

16    Aviation has not responded, but AIS/UTI has responded.  They

17    have no assets -- no attachable assets that I can tell from

18    their P&L and from their --

19         THE COURT:  Are they shell corporations; or what are

09:10:17AM 20    they, as far as you know?

21         MS. MILLER:  Well, I don't believe they're shell

22    corporations.  I think there are a number of them that do

23    interchange with each other, and they do that, my

24    interpretation of it, apparently every year to avoid the IRS

09:10:30AM 25    indication that they're not temporary employees.

1          So, essentially, in Mr. Gagnon's case, UTI was

2  the first entity with whom he contracted.  They -- they were

3  replaced -- actually, it was almost a year and a half or more

4  than a year and a half later -- with the exact same structured

09:10:50AM  5  company, only it was renamed.  So, whether or not they're

6  shell companies, there are many of them.  They all do the same

7  things.  They're all owned by the same people.  They all have

8  the same officers.  They all have the same phone number.  They

9  all have the same address.  So -- they just don't own any

09:11:08AM  10  property that would be attachable, any real property.

11        THE COURT:  So, the AIS and UTI companies are simply

12  companies that are used by, for example, Wing Aviation, LLC,

13  as an employer or co-employer or joint employer for purposes

14  of void -- of avoiding direct employment or not?

09:11:31AM  15        MS. MILLER:  That would be -- that would be correct,

16  yes.  And it would be comparable to a staffing agency.

17        THE COURT:  Okay.

18        MS. MILLER:  But by the economic control, truly on

19  the day-to-day control of the workers was with Wing Aviation.

09:11:48AM  20        THE COURT:  All right.  Mr. Chadwick, is that the

21  proper -- somewhat proper description of the role that AIS and

22  UTI play, sort of staffing companies?

23        MR. CHADWICK:  Yes, Your Honor.  I mean, I would

24  take issue with the fact that they're shell companies.

09:12:03AM  25        THE COURT:  Well, that was my question as to whether

1   or not they were shell companies.  That's what I was asking.

2   And by that I meant -- there is nothing wrong with having

3   shell companies.  They are perfectly legal.  By that I meant

4   whether or not these companies were true standalone companies

09:12:18AM 5   or whether they are simply dependent companies on contractual

6   relationships with the mother ship.

7          MR. CHADWICK:  Okay.  No.  They are standalone

8   companies that contract with entities like Wing Aviation to

9   provide staffing, in particular, individuals who do

09:12:37AM 10   maintenance work.  So -- but I would also take issue that --

11   you know, to any type of shenanigans to avoid IRS exposure,

12   but -- I could also say that as of December 1st of 2008, you

13   know, the financial condition of AIS Tech Services was much

14   better than it is today.

09:13:01AM 15          THE COURT:  Well, but that was a situation that

16   existed -- whatever that financial situation was or at that

17   time, it existed at the time that the -- that the -- I don't

18   want to say the deal; but the way that this lawsuit was

19   resolved, wasn't it?

09:13:25AM 20              In other words, in 2008, the financial

21   situation at the time that the representations were being made

22   to the Court that -- that the matter would be handled by your

23   companies, you had -- you were fully aware -- or your

24   companies were fully aware of the financial situation that

09:13:47AM 25   those companies were in at that time.

1          MR. CHADWICK:  That's correct, Your Honor.

2          THE COURT:  Well, here's my concern.  If these are

3  temporary staffing agencies, they would have no assets.  Say

4  the profits that they would receive from the overhead -- the

09:14:06AM  5  over -- the override or the percentage of staffing, I guess,

6  based upon gross salaries that are charged, they would have

7  some override in that; and that would be the -- that would be

8  the only asset, if anything, they would have.  These -- these

9  were not really -- these are not true account receivables.

09:14:29AM  10  These are salaries that are being paid, for example, by Wing

11  Aviation who says:  I want to hire ten people, and I will pay

12  you X number of dollars for these ten people.  They write the

13  check, and then you divvy up that money with some balance

14  being kept by you -- and I say "you," meaning your

09:14:46AM  15  companies -- as a profit or as a margin for having provided

16  this, quote, service.  Isn't that the way these --

17          MR. CHADWICK:  That's correct, Your Honor.

18          THE COURT:  All right.  So, there are no -- in a

19  real sense, you're not really producing or generating

09:15:03AM  20  anything.  You are simply doing a service for a corporation

21  that either doesn't want to do it or can't do it.

22          MR. CHADWICK:  That's correct.

23          THE COURT:  Okay.  So, then you would not have a

24  profit margin that's not being divvied up to the owners or to

09:15:24AM  25  the stockholders.  And so, the conflict here would be between

1 the judgment that the plaintiff has and the final attorney

2 fees issues that are trying to be resolved.  That would fly in

3 the face of the margin that your company expects to receive.

4 So, there's no built-in profit margin for this company.

09:15:58AM 5          MR. SCHUELER:  Judge, can I speak for a moment?

6          THE COURT:  I want to hear him.

7          MR. CHADWICK:  Well, I mean, I think -- you know,

8 just to tell you how the December 1st transpired, I mean,

9 Mr. Schueler came in and said, you know, I want to propose a

09:16:10AM 10 stipulation.

11          And I visited with the client and said:  Is

12 this a financial obligation that you can undertake?  And the

13 representation at that time was yes.  It was a growing

14 company.  There was profit.  And my understanding is that the

09:16:27AM 15 client was able to pay a judgment at that time.  It is just

16 that at this particular time, it is just we're dealing with no

17 profit margin.

18          THE COURT:  Well, let me tell you the problem that I

19 have.

20          MR. CHADWICK:  Okay.

21          THE COURT:  Where there are generally -- and I --

22 the problem in part is this:  That in most circumstances where

23 the Court has been faced with this issue -- generally

24 speaking, this comes up in similar cases or Title VII cases

09:16:57AM 25 where you have an employer who goes out and gets a Prostaff or

1  some other company to do its hiring for it and then puts these

2  people in play in another company.  Generally, these are

3  considered in law to be joint employers.

4          And what has happened is the parties here --

09:17:19AM 5  apparently, these people like Gagnon and others were doing

6  work -- well, Gagnon, in particular.  We don't need to worry

7  about others.  They were doing work because Wing Aviation,

8  LLC, needed this service.  When Wing Aviation needs a service,

9  it comes to you.  You do the contracting of the employer.  And

09:17:39AM 10  apparently handles, I gather, all of the taxes?

11          MR. CHADWICK:  Correct.

12          THE COURT:  All of the withholdings and pay all of

13  the -- I don't know if you have worker's compensation and

14  other kinds of benefits -- quote, benefits -- that employees

09:17:55AM 15  would normally be provided, whether that's being provided by

16  AIS; and I would assume that it is.  But you are providing a

17  whole service.

18          When Wing Aviation, LLC, gets Gagnon, they're

19  getting a package deal; and they, at least theoretically,

09:18:17AM 20  would not be responsible for anything that happened to Gagnon.

21  But that's not true as it relates to how that works across the

22  board because if Gagnon were somehow mistreated -- let's say

23  discrimination of some sort, the way he is managed and

24  handled -- he's going to sue your company, but he's also going

09:18:36AM 25  to sue Wing Aviation because the situs for this event is Wing

1    Aviation, LLC's site.

2              So, you have this creation in law by companies

3    to avoid perhaps certain liabilities and certain

4    responsibilities; but you don't always avoid all of the law as

09:19:00AM  5    it relates to the federal law, perhaps.  I'm not sure.  So,

6    I'm simply asking that because if this is -- if this situation

7    is the way I perceive it to be, AIS and UTI don't really ever

8    have to pay this man because they will never have the money to

9    pay him.  The only money they're going to have is money that

09:19:24AM 10    they get from a continuing relationship with the Wing

11    Aviation.  They're not getting money -- Wing Aviation,

12    theoretically, isn't giving you a dime for this lawsuit,

13    theoretically.

14              MR. CHADWICK:  Right.

09:19:36AM 15              THE COURT:  And so, here's the question I have for

16    you:  Who is paying your fees?

17              MR. CHADWICK:  Well, I could tell you that --

18              THE COURT:  I didn't ask you how much.  That's the

19    second question.  Who is paying your fees?

09:19:50AM 20              MR. CHADWICK:  I haven't been paid in quite some

21    time.

22              THE COURT:  Well, but I gather the check would come

23    from AIS or UTI.

24              MR. CHADWICK:  That's correct.

09:19:59AM 25              THE COURT:  All right.  And here's my concern:  That

1    if the check comes from AIS or UTI, the question is how much

2    time have you put into this case?  Just a round figure.

3              MR. CHADWICK:  I mean, it's about 130,000.

4              THE COURT:  Yeah.  You put in more time than this

09:20:18AM  5    case is worth, in terms of the judgment that Gagnon has and

6    the amount of money that the other counsel is receiving.  In

7    other words, the amount of money that you have -- the amount

8    of time that you have expended apparently exceeds the amount

9    of time that counsel has expended.

09:20:37AM 10              MR. CHADWICK:  And -- but understand that the

11    onstaff time related to claims that were resolved on summary

12    judgment in the defendant's favor which included age

13    discrimination claims under the ADA and claims under the

14    Family Medical Leave Act.

09:20:54AM 15              THE COURT:  I understand that.  And my primary

16    concern is whether or not the plaintiff in this case, whether

17    or not there's substance to the argument to be made that Wing

18    Aviation has simply danced its way out of this situation,

19    attempted to and failed in the sense of the paperwork but at

09:21:18AM 20    least in spirit and is going to leave you holding the bag and

21    wrestling with counsel about attorney's fees.

22              Why haven't they simply paid Mr. Gagnon

23    already?  I mean, these are wages.  These are not -- this is

24    not some judgment that finds itself in some major, let's say,

09:21:44AM 25    punitive damages or some -- something that could rile you up.

1    This is actually money out of his pocket that he didn't get

2    paid, right?

3              MR. CHADWICK:  My understanding is that there are

4    two reasons why; number one, the financial condition of AIS

09:22:01AM  5    Tech and United Technisource, which is actually worse today

6    than it was back in June when we tried to negotiate the

7    settlement with counsel for the plaintiff.  The second issue

8    is something that my office looked into is to what extent

9    would we at least muddy the waters with respect to our

09:22:21AM 10    objections to the attorney's fees by paying off at least part

11    of the judgment.

12              THE COURT:  Well, you can't muddy the waters.  He's

13    due whether she gets paid or not, whether Ms. Miller gets paid

14    or not.

15              MR. CHADWICK:  Right.

16              THE COURT:  The Fifth Circuit has already spoken

17    that, and it is over.  And what you have running now is a

18    substantial -- potential for penalty and interest against that

19    because there's a penalty for not paying in the first

09:22:45AM 20    instance.  And certainly the penalty or interest that would be

21    due on wages unpaid -- I'm not sure.  I haven't looked at the

22    statute.  It may be just miniscule.  I'm not sure.  It may be

23    one and a half percent or whatever the Government claims.  But

24    it certainly has the potential of being a penalty beyond what

09:23:03AM 25    is actually owed because of the wages.

1          MR. CHADWICK:  I understand.

2          THE COURT:  Well, Mr. Schueler.

3          MR. SCHUELER:  Two things, Your Honor.  First, you

4   know, what AIS and United Technisource do is the same thing,

09:23:19AM  5   as you say, Prostaff, Administaff.  They're not shell

6   companies, and Wing Aviation is not their only customer.

7   They've got lots and lots of customers.  And I think part of

8   the problem is, you know, we have been through the worse

9   recession, at least in my life, over the last year or two.

09:23:35AM 10   So, it is no surprise that companies like AIS and United

11   Technisource have -- their incomes have declined; but they're

12   no different than any other service business, law firms.  I

13   mean, we don't have the assets.  We've got some desks and

14   computers and books; but if we don't have clients, you know,

09:23:50AM 15   paying fees on a regular basis, we're out of business.  The

16   same thing is true with any service company.

17          So, you know, I think the suggestion that there

18   was any sort of scheme or conspiracy is really not even

19   reasonable.  None of us could have predicted, as we stood here

09:24:08AM 20   in December of 2008, that this company -- these companies

21   would go into a recession.  I'm sure the aircraft business

22   probably gets hurt more than most when things go down.  So,

23   their income and revenues and assets have declined; but nobody

24   could have predicted that.

09:24:25AM 25          You know, my real issue is -- and I think --

1  let me also say, even though up until now I didn't think I had

2  a dog in this fight, I think the real issue is not so much the

3  back wages.  In fact, I think my client would agree to pay not

4  only the wages but the liquidated damages.  We're only talking

09:24:43AM  5  about $8,000 even with the liquidated damages.  I think the

6  dispute has always been with the large amount of attorneys

7  fees which the plaintiff has claimed and just what

8  Mr. Chadwick said, that, yes, we spent a lot of time and money

9  on the case; but most of it was dedicated to defending the ADA

09:25:02AM 10  and the FMLA claims which the Court dismissed on summary

11  judgment.  I mean, if you read the deposition, that's

12  90 percent of what he was questioned about in the deposition.

13  That's what most of the briefing and research was about.

14          THE COURT:  Well, I've reviewed the report -- I

09:25:19AM 15  mean, the docket sheets -- I'm sorry.  Not the docket sheets,

16  but the --

17          MS. MILLER:  The invoices.

18          THE COURT:  I'm sorry?

19          MS. MILLER:  The invoices.

09:25:31AM 20          THE COURT:  Yeah.  That's a good word.

21              Lawyers prepare these hourly rate sheets and

22  invoices.  I have reviewed those, and I'm not really sure that

23  much of this aggravation isn't a result of just having not

24  done it in the first instance.  And I don't mean that as an

09:25:55AM 25  accusation of any sort, but I suspect that we were looking at

1  30 or -- about 35 or 40 thousand -- somewhere in the range of

2  $40,000 in legal fees and $8,000.  So, we are looking at a

3  50,000-dollar matter, more or less, becoming a 100,000-dollar

4  matter because the Fifth Circuit said:  She's entitled to

09:26:16AM 5  appellate fees because this appeal is not valid in the sense

6  of it raising valid issues.

7          And so, we have looked at something that has

8  grown as a result of not doing in the first place; and I'm not

9  sure that this isn't -- well, I'm absolutely sure this is a

09:26:37AM 10  self-inflicted wound; that is, you fall on your own sword --

11  not you, but the clients fall on their own swords by their

12  judgments.  Well --

13          MR. SCHUELER:  And, you know, as far as myself and

14  Wing Aviation, we've actually thought that there had been a

09:26:54AM 15  resolution based on the stipulation and that whether before or

16  after appeal --

17          THE COURT:  But, see, don't you see counsel doesn't

18  want to get into another lawsuit with AIS and UTI?  So, she

19  makes a deal; and she says:  I will take 10,000 a month for

09:27:10AM 20  the next 10 months or whatever.  And after the first or second

21  payment, counsel has a problem because he hasn't been paid.

22  And so, his priority would be his payment; and that is a

23  conflict with what his client has done.  But the priority

24  takes second -- the priority takes a back seat -- priority to

09:27:30AM 25  pay Miller takes a back seat because there are other more

1  important things to do.

2              Now, how does she get her money?  She comes

3  into court, and she brings either a lawsuit and creates

4  another 50,000-dollar bill on both sides of the issue.  And

09:27:43AM  5  so, this thing just goes on and on.  And I'm simply lamenting

6  the challenge here, the problem here, because it is not one

7  that -- that AIS or UTI apparently wants to have resolved

8  except, according to what they believe to be, I gather, their

9  financial ability based on whatever their condition might be.

09:28:12AM 10  And I gather what I am hearing now is they probably don't have

11  the ability to pay what they offered to pay her some time ago,

12  I mean recently.

13              So, are we not wasting our time -- and what I

14  mean by "time," I mean your time sheets by having you come in

09:28:27AM 15  and contest and argue these matters?  Why is it that you at

16  UTI and AIS would challenge anything, rather spending more

17  money and more time running up another bill and having parties

18  come down?  I think it is a little bit dismay.

19              Tell me why LLC has to be in this lawsuit.  I

09:28:49AM 20  went through, Ms. Miller, what you presented to the Court; and

21  there is kind of a judicial shuffle here -- or a courthouse

22  shuffle, maybe I should say -- of course, it didn't happen at

23  the courthouse.  I guess it happened in Austin -- where

24  Mr. Wing or whoever he is -- I'm not sure if it is Wing.  I

09:29:11AM 25  guess the name of the gentleman is Wing -- can't really

1   think -- figure out how he wants to present himself, but it

2   looks as though what has happened is they just got confused

3   about who they were.

4           MS. MILLER:  Well, that's a misidentification, Your

09:29:30AM  5   Honor; and that goes -- would go under Rule 60(b), not 60(a).

6   And a misidentification under 60(b) has to be corrected within

7   one year.  So, they are foreclosed from that correction.  It

8   is also -- and I --

9           THE COURT:  Even if, quote, that was the intent --

09:29:51AM  10  and I don't -- I'm not trying to put words in your mouth, but

11  even if the dismissal that occurred was intended -- whether by

12  the right name or the wrong name, intended by the party

13  this -- I believe at that time there was only one Wing

14  Aviation, whether it was Inc. or -- I think it was LLC because

09:30:13AM  15  the initial -- the first Wing Aviation, LLC, was created in

16  2001.  It went out of business on June 24th, 2005.  And then

17  in -- I don't know why it did it the way it did, but somehow

18  this Conroe versus Houston thing comes into play.  So, on

19  June 24, Wing Aviation, LLC, rises up out of the dust again.

09:30:39AM  20  Apparently, it's -- is it the Delaware corporation at that

21  time?

22          MS. MILLER:  We've sued the Delaware corporation,

23  Your Honor.  And it is my habit -- and probably because I was

24  a corporate executive before I went to law school at 40.  So,

09:30:51AM  25  I understand corporate structure; and I always look at it.

1    And I find it fascinating that the switches are constantly

2    played not just here but in any number of cases.  I have

3    another one which was a very big switch.

4              So, I started -- we sued LLC Delaware because

09:31:10AM  5    that was the only Wing Aviation, LLC, in existence at the time

6    of the lawsuit.

7              THE COURT:  Correct.

8              MS. MILLER:  Okay.  And researching it at the

9    Secretary of State, there were two Wing Aviation LLCs

09:31:25AM  10   established in Texas.  Both of those are defunct.

11             THE COURT:  And there was never a Wing Aviation,

12   Inc., that was a party to this suit.

13             MS. MILLER:  Yes.  Yes.

14             THE COURT:  No, no, no.

09:31:37AM  15             MS. MILLER:  Oh, never a party to this suit,

16   correct.

17             THE COURT:  Yeah.  Because I think what you provided

18   to me was June 28th of '01 that that company went out of

19   business and became something else, perhaps.

09:31:45AM  20             MS. MILLER:  It went to John Wing Aviation and then

21   John B. Wing Aviation.  Still, all of them doing business

22   under these assorted names; and that's why I can't abide by

23   this just being a typo, which is not the way that they have

24   indicated that they work.

09:32:05AM  25             THE COURT:  Well, what we do know -- irrespective of

1    what plays out in your gut, as we say, what we do know is that

2    there was no Wing Aviation, Inc., in 2008 or 2009 when this

3    matter was being resolved.  We know that.

4              MS. MILLER:  It was a predecessor of an existing

09:32:28AM  5    company.

6              THE COURT:  Right.  Or at least on paper we know

7    that.

8              MS. MILLER:  Correct.

9              THE COURT:  I don't know what was going on in the

09:32:33AM  10   offices.  But we know that by the -- it became inactive on

11   June 28th.  And in that -- when this lawsuit was filed in

12   2007, in May of 2007, there was an existence -- two companies,

13   I gather.  One was Wing Aviation, LLC; and the other was John

14   B. Wing Aviation, Inc., which I gather are still -- both

09:33:04AM  15   perhaps still in play.

16             MS. MILLER:  That's the predecessor of Wing

17   Aviation, Inc., correct.  The John B Wing --

18             THE COURT:  John B. Wing.

19             MS. MILLER:  Correct.

09:33:11AM  20            THE COURT:  Yeah.  But it is still in use.  It was

21   still in use, according to the paperwork.  And they were both

22   formed in the same year and the same month, back in March of

23   1993.

24                  Let's go back now to the original problem.  The

09:33:26AM  25   problem is that Wing Aviation, LLC, apparently was never an

1 employer for Timothy Gagnon.  And I say "never an employer"
2 meaning even though they were sued and brought into the suit
3 and defended the lawsuit, I'm not really sure why that wasn't
4 the issue.  And maybe that was raised at the very outset, that
09:33:55AM 5 we are not his employer, et cetera, et cetera.  That probably
6 was a defense.  It just could not get resolved in the
7 immediate.
8           The point is that if they were never the
9 employer, how do they now remain in this lawsuit?  How would I
09:34:13AM 10 keep them in this lawsuit, even though what -- the way in
11 which they attempted to get out did not effectuate that?
12           MS. MILLER:  Wing Aviation, LLC, was the employer.
13 Correct.
14           THE COURT:  Well, that was the site.  That was
09:34:25AM 15 certainly the place where Mr. Gagnon went to do his work.
16           MS. MILLER:  Do you mean not the employer as to
17 AIS/UTI or not the employer as to Wing Aviation, Inc.?
18           THE COURT:  Well, I'm sure Wing Aviation, Inc., has
19 anything to do with anything by 2007.  At the time that
09:34:44AM 20 Mr. Gagnon was working, he wasn't -- couldn't have been
21 working for Wing Aviation, Inc., because it was no longer in
22 use as a company.  John Wing Aviation was no longer in use.
23 All of these companies had become defunct except those two,
24 right?
09:35:03AM 25           MS. MILLER:  Well, I don't know which two; but --

1          THE COURT:  The two would be John B. Wing Aviation,

2    Inc. that was still in use in 2007 and Wing Aviation, LLC,

3    that was still in use.

4          MS. MILLER:  Okay.  When you say "in use," it's

09:35:20AM 5   still recognized as viable companies by the Secretary of

6    State.

7          THE COURT:  Correct.

8          MS. MILLER:  Whether or not the other entities that

9    were superseded were still used -- and they still are, for

09:35:32AM 10   example; and that's how Montgomery County is just an example.

11   Montgomery County has a lease with Wing Aviation, LLC, Texas;

12   but Wing Aviation, LLC, Texas -- either one of them -- there

13   are two of them, and neither one of them exist anymore.

14          So, it is a shuffle of entities of which we

09:35:53AM 15   view this as being another shuffle in an attempt to then

16   stream along -- get Wing Aviation in it, and then Wing

17   Aviation is an empty company.  So, we can't collect against

18   Wing Aviation, Inc., either.  But -- but it didn't work.

19          THE COURT:  All right.  I'm not really sure that

09:36:13AM 20   this issue has ever been resolved in a court of law except --

21          MS. MILLER:  I don't believe it has.

22          THE COURT:  -- the question of whether or not the

23   Court has the power and authority or should exercise the power

24   and authority, if it has it, to correct an error on the part

09:36:32AM 25   of the -- of part of Wing Aviation, Inc.  In other words, are

1   you filing, as Ms. Miller would argue, under the wrong rule?

2   And if so, are you now asking me to do something technically

3   irresponsible on a second time around?

4            MR. SCHUELER:  I don't think so, Judge.  I mean, I

09:36:51AM 5   think the case falls clearly within Rule 60(a).  I've cited

6   you, you know, a half a dozen cases.

7            THE COURT:  Sure.

8            MR. SCHUELER:  And clearly the Fifth Circuit is

9   saying the Court can -- and not only can, but the Court

09:37:04AM 10   should, almost a must -- correct typographical, clerical

11   errors in documents.  So, even when we were over here,

12   everybody was talking about Wing Aviation, meaning Wing

13   Aviation, LLC, the -- one of the defendants in the court in

14   the case.  Even Your Honor said:  So, we are going to dismiss

09:37:24AM 15   Wing Aviation from this case.  That was everybody's intent.

16            And, you know, it is my fault in the sense that

17   I am the attorney and responsible for the clerical errors of

18   my staff.  The secretary that typed it put "Inc." instead of

19   "LLC."  I didn't notice it.  Honestly, none of the counsel

09:37:43AM 20   noticed it.  The Court didn't notice it.  Not that they would,

21   necessarily; but I'm just saying it was a basic clerical

22   mistake.

23            It's just what those cases say, that -- where

24   the Court can do what's called -- the Fifth Circuit calls a

09:37:59AM 25   judicial eraser.  It's not that there -- there was no entity

1    at that time named Wing Aviation, Inc.  So, it can't be a

2    misnomer for misidentification.  The only two companies that

3    existed were Wing Aviation, LLC, which was the party to this

4    lawsuit, and John B. Wing Aviation, Inc.

09:38:17AM  5              I don't know exactly what the corporate

6    structure of the company is.  I'm sure Ms. Miller, as a

7    corporate lawyer, would know; but -- I mean, I know from my

8    exposure to my corporate partners, there's lots of different

9    reasons why companies incorporate and change from a

09:38:34AM 10  corporation to an LLC.  I don't know what the reasons were,

11   but I don't think there's anything nefarious about the fact

12   that they did that.  It is operated as Wing Aviation, LLC,

13   from -- at least for all the time that's relevant to this

14   lawsuit.  And but for this clerical typographical error, we

09:38:53AM 15  would not be here at all.

16              I mean, I will say the Fifth Circuit cases

17   under Rule 60(a) are, I think, very clear, very direct.  And

18   what the Fifth Circuit is going to look to is what was the

19   intention of the Court.  And I think there's no doubt that the

09:39:08AM 20  Court's intention was to dismiss Wing Aviation, LLC; and that

21   was the intention of the parties.  And as I say, but for this

22   typographical error, there would be no issue.  We wouldn't

23   even be here.

24              THE COURT:  So, you disagree with Ms. Miller's

09:39:25AM 25  argument that we had a year to get this straightened out; and

1  failing that, it is too late for the Court to do anything.

2  You disagree with that, counsel?

3          MR. SCHUELER:  Oh, I disagree with that.  It is not

4  a 60(b) motion.  It's clearly a 60(a), a clerical error -- I

09:39:42AM  5  mean, a clerical, typographical error.  And, honestly, Your

6  Honor, I had no idea that it was an issue until I saw her

7  motion; and that's the first time that -- this motion a month

8  or two ago -- that anybody has raised the issue that, hey, you

9  misidentified or there was an error -- a typographical error

09:40:03AM  10  in the identification of the party.  Even the certificate of

11  interested parties that she filed with the Fifth Circuit says

12  Wing Aviation, LLC, (Wing Aviation, Inc.).  And then says

13  "voluntarily dismissed and then terminated by the Court."

14          So, I mean, even if you -- and, you know, I'm

09:40:22AM  15  not shown as an interested counsel in the Fifth Circuit.  I

16  wasn't -- my client was not a party to the appeal.  If I got a

17  copy of the brief, and I don't dispute that she might have

18  sent it to me -- she didn't send it to me in the basis that I

19  was counsel of record for an interested party.  And all I'm

09:40:40AM  20  saying is I think that further demonstrates the understanding

21  that everybody connected with this case has had since December

22  of 2008 that Wing Aviation, the defendant in this case, was

23  dismissed; and once the Court entered a final judgment; that

24  dismissal became final.

09:40:55AM  25          THE COURT:  All right.  Ms. Miller, last word.

1          MS. MILLER:  Thank you.  Just a couple of issues.
2  One, Mr. Schueler indicates that nobody noticed.  Well, we did
3  notice.  We were -- at that point we weren't wanting to
4  dismiss anybody.  We didn't want to.  And it is not the
09:41:11AM 5  intention of the Court that governs here.  It is the intention
6  of the parties.  It was not our intention to dismiss Wing
7  anybody.  And so, therefore, it is one of misidentification.
8  They are two entities, whether or not they are functioning
9  entities.  They are two separate entities, and it is clearly a
09:41:34AM 10 question of misidentification, under which that would fall --
11 you know, it would fall under Rule 60(b) which demands a
12 one year correction of it.
13          Also, there's more case law -- and it is cited
14 probably ad nauseam in my brief -- that once the Court has to
09:41:52AM 15 go into pleadings and once the Court has to go into facts and
16 has to go into briefing by the parties, it clearly is not
17 something that is a clerical mistake under Rule 60(a).  So, by
18 the very fact that we are here today arguing it, presenting
19 cases, that dispels any notion that it would fall under 60(a)
09:42:10AM 20 without a statute of limitations of one year.
21          THE COURT:  Well, I think part of the reason you are
22 here arguing it is because of my concern as to whether or not
23 there was something that the Court missed in this discussion
24 and this dialogue that occurred.  While I always have
09:42:29AM 25 reservations about dismissing a party in the face of a trial

1    and/or other proceedings, I rely upon the attorneys to make

2    that judgment call; and hopefully they can live by their

3    decisions.   In this instance, the Court entered an order

4    presented to it without any concern that it was a correct or

5    incorrect party.   It is not a matter of me making that

6    decision.

7              So, what I am going to do is go back now and

8    meditate upon these documents.   I've read through them, and

9    now I'm going to look at some of the underlying cases to get a

10    sense of whether or not I'm making, let's say, an error in my

11    judgment in this matter; and then I will go ahead and make

12    some decision.

13              And let me just say as it relates to the

14    attorney's fees, there is -- you know, in my opinion, the best

15    evidence of whether or not a fee is reasonable is what another

16    party will spend to defend it.   Now, the argument here being

17    made -- well, we defended.   We put a lot of work into two

18    claims that did not go forward -- those claims that did not go

19    forward require the same evidence as the claim that did go

20    forward.

21              Now, while the summary judgment motions that

22    were filed by the parties might have required some additional

23    work on the part of the defense -- and certainly in response

24    on the part of the plaintiff -- if any carving were to be

25    done, it certainly has to be done as it relates to simply the

1    Motion for Summary Judgment because the claims are claims.

2    And we know how the pleading law is in this country; that is,

3    you plead as many claims as you need to plead and can plead

4    under those facts and under the circumstances.  And it does

09:44:22AM  5    not burden the parties or the Court to carry those particular

6    pleadings.  And, of course, the distinction here to be made,

7    as it relates to work, has to be and can be carved if there is

8    to be done.

9             So, there you have it.  I mean, I can look at

09:44:40AM 10    Ms. Miller's time sheets and determine whether -- or how much

11    time she spent on responding to the Motion for Summary

12    Judgment; but that's the extent of any reduction, if any, that

13    should occur in this case.  So, you get a sense of where I am

14    going with this matter.

09:44:58AM 15             Anything else, ladies and gentlemen?

16             MS. MILLER:  One other issue, Your Honor.

17             THE COURT:  Sure.  Go ahead.

18             MS. MILLER:  On the Wing Aviation issue, it would be

19    our position that that dismissal was improper because it

09:45:11AM 20    wasn't signed by the parties -- by all parties.  And at that

21    point, we had an oral agreement; but it became apparent that

22    we didn't want to sign that dismissal.  And, therefore, it

23    wasn't a legally appropriate dismissal, which we could have

24    appealed had it dismissed Wing, LLC.  But since it didn't, we

09:45:32AM 25    didn't have the right or we didn't have the necessity to

1    appeal it at that point.

2              Wing is arguing now that because of their

3    mistake, we've lost that right to appeal if they are dismissed

4    from the suit, which -- you know, it is just kind of a

09:45:48AM  5    Catch-22 on that one.

6              THE COURT:  All right.  I think I have heard it and

7    more than once.  So, I'm going to excuse you at this point;

8    and the Court will take this matter up and try to get a

9    judgment entered that won't be appealed.

09:46:06AM  10             Thank you very much.  Have a good morning.

11             ALL COUNSEL:  Thank you, Your Honor.

12             THE COURT:  You may be excused.

13         (Proceedings concluded.)

14                           *  *  *

15   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled cause, to the best
16   of my ability.

17

18   //s_____     03/01/2011
     Stephanie Kay Carlisle          CSR, RPR         Date
19   Official Court Reporter

09:46:12AM  20

21

22

23

24

25